IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARL GEHRKE, )
 )
    Plaintiff, )
 )  No. 12 C 3310
vs. )
 )  Magistrate Judge Schenkier
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security,[1] )
 )
    Defendant. )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Carl Gehrke has filed a motion for summary judgment seeking reversal and remand of the final determination of the Commissioner of Social Security ("Commissioner") to the extent it denied him Disability Insurance Benefits ("DIB") beyond a closed period of approximately eighteen months (doc. # 25). The Commissioner has responded with its own motion for summary judgment seeking affirmance of the Administrative Law Judge's decision (doc. # 33). For the following reasons, the Court grants Mr. Gehrke's motion and denies the Commissioner's motion.

I.

Mr. Gehrke filed for DIB on November 5, 2009, alleging that he became unable to work on March 7, 2007 due to depression and a knee injury (R. 109). His application was denied initially on April 7, 2010, and again upon reconsideration on August 4, 2010 (R. 75, 81). Mr.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security, Carolyn W. Colvin, as the named defendant.

[2]On November 11, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 12, 14).

Gehrke then requested, and was granted, a hearing before an Administrative Law Judge ("ALJ"), which took place on May 31, 2011 (R. 29-72). The ALJ issued an opinion granting partial benefits on July 18, 2011 (R. 13-22). The Appeals Council then denied Mr. Gehrke's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-3). *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. Part A briefly sets forth Mr. Gehrke's background, followed by his medical record in Part B. Part C discusses the hearing testimony, and Part D sets forth the ALJ's written opinion.

### A.

Mr. Gehrke was born on November 15, 1963, and was 47 years old at the time of the hearing (R. 33, 73). He is married and has two children (R. 34). He has a tenth grade education and spent much of his early career training race harness horses (R. 50). He then worked as a truck driver, bus driver and document shredder (R. 51-52). Mr. Gehrke's last job was with Walker Processing, for whom he did a bit of "everything," including working a drill press, sandblasting and driving a fork lift (R. 52-53). In March 2007, Mr. Gehrke injured his right knee on the job (R. 231).

### B.

The medical record commences on March 12, 2007 with a report from Howard Freedberg, M.D., an orthopedic surgeon (R. 231-32). Dr. Freedberg indicated in his medical notes that Mr. Gehrke claimed to have suffered a job site injury to his knee on March 1, 2007, and that an x-ray performed at a medical clinic revealed a chip fracture of the right patella (R. 231). Dr. Freedberg ordered additional x-rays and noted the possibility of a patellar fracture and

subluxation (improper tracking of the kneecap) (R. 232). Mr. Gehrke had follow-up appointments with Dr. Freedberg every few weeks during the Spring of 2007, including one on May 14, 2007 in which Mr. Gehrke reported that his knee pain was almost gone (R. 236). Dr. Freedberg released him from his care on that date and cleared him to return to work (R. 237).

Mr. Gehrke's knee pain returned in short order upon his return to work, so he followed-up again with Dr. Freedberg, who concluded by July 2007 that Mr. Gehrke had "failed conservative measures" and that arthroscopic surgery was indicated (R. 240). Dr. Freedberg performed an arthroscopic procedure in August 2007 that resulted in a diagnosis of "right knee status post patellar subluxation in conjunction with medial femoral condylar damage" (R. 242). Mr. Gehrke continued to have significant pain in both his knee and his back, leading Dr. Freedberg to note that he was "extremely surprised [with] . . . the very poor motion Patient has today. I am not sure if this is his inability to tolerate pain, or any developing CRPS [Complex Regional Pain Syndrome]. He understands the gravity of his predicament" (R. 243).[3] X-ray studies at that point in time indicated normal alignment and no evidence of a fracture, dislocation, or any other bony or soft tissue lesion (*Id.*). Mr. Gehrke had a follow-up appointment on October 17, 2010, at which time Dr. Freedberg expressed frustration over Mr. Gehrke's failure to comply with his exercise program and opined that rehabilitation of the knee would be "a long uphill climb" (R. 245).

Dr. Freedberg performed a second surgery in October 2007 to straighten out Mr. Gehrke's knee under anesthesia. At this point, his diagnosis was right knee arthrofibrosis (R.

---

[3]Complex Regional Pain Syndrome is an uncommon pain syndrome that typically affects an arm or leg after an injury, surgery, stroke or heart attack. www.mayoclinic.org/diseases-conditions/complex-regional-pain-sydrome/basics. Pain associated with this condition is out of proportion with the severity of the initial injury. *Id.* Symptoms include continuous burning or throbbing; swelling; changes in skin temperature, skin texture, and skin color; stiffness and decreased mobility. *Id.*

3

247).[4] At an examination on November 1, 2007, Dr. Freedberg wrote into his notes that Mr. Gehrke had "put himself behind the eight ball" and that he would have to work "a hundred times harder than anybody else" to improve (*Id.*). Dr. Freedberg attributed Mr. Gehrke's lack of progress to his unwillingness to work hard in physical therapy, resulting in arthrofibrosis (R. 249).

In December 2007, Mr. Gehrke reported that he took a wrong step and exacerbated his knee condition (R. 362). Dr. Freedberg evaluated the knee and stated that surgery was indicated if the knee failed to improve (*Id.*).

In January 2008, Mr. Gehrke sought a second opinion from Dr. Gregory Markarian (R. 607). Dr. Markarian performed a third surgery on Mr. Gehrke's right knee on March 5, 2008 (R. 399). The surgery, a debridement of the right patellar tendon and augmentation, was intended to improve blood flow and repair tissue (R. 421).

On July 8, 2008, Dr. Markarian completed a Notice of Work Status on Mr. Gehrke's behalf that found him unable to work and in need of additional physical therapy three times a week for six weeks (R. 575). Dr. Markarian extended the work restriction once again on August 18, 2008 (R. 570). Both notices included the same diagnoses of medial hamstring tendonitis and kneecap pain.

On September 16, 2008, Dr. Markarian completed a third Notice of Work Status indicating that Mr. Gehrke was able to return to a "light-duty desk job" that involved no heavy squatting or kneeling and no lifting or carrying in excess of 20 pounds (R. 564). He indicated in

---

[4] Arthrofibrosis is a condition that can affect knee joints after they have been injured, operated upon or both. The condition leads the knee to form extensive scar tissue that causes shrinkage and tightening of the knee's joint capsule, which in turn limits range of motion and functionality. http://arthrofibrosis.com/faq/

his notes that Mr. Gehrke had "maxed out in terms of his physical therapy and . . . [that] permanent restrictions are in order" (R. 565).

On September 22, 2008, Physical Therapist Mike Olson attempted to complete a Functional Capacity Evaluation on Mr. Gehrke following a referral from Dr. Markarian (R. 527-29). Mr. Olson spent 3.5 hours with Mr. Gehrke but ultimately concluded—without inferring intent—that he could not make any recommendations because Mr. Gehrke could not tolerate many of the necessary examinations on account of reported pain (R. 529). Mr. Olson suggested that greater weight be placed on objective rather than subjective tests as his own evaluation could not be considered an accurate representation of Mr. Gehrke's true physical capacity (*Id.*).

Frank Berardi, an occupational therapist, attempted a second Functional Capacity Evaluation on October 6, 2008 (R. 612-15). Mr. Berardi observed that Mr. Gehrke exhibited "sub-maximal effort" and questionable subjective reports that invalided the test's accuracy (R. 612). Objective measurements of Mr. Gehrke's physical output, including heart rate, body mechanics and accessory muscle recruitment, "indicated that he was exerting low levels of physical effort for test activities performed" (*Id.*). Mr. Berardi noted that Mr. Gehrke "reported experiencing high levels of pain which limited his physical output for all of the strength, mobility and agility subtests that were performed" (R. 612).

On October 9, 2008, Dr. Markarian re-evaluated Mr. Gehrke following the two unsuccessful functional capacity evaluations. The doctor found that the evaluations showed a lack of improvement and then opined that Mr. Gehrke "will be at maximal medical improvement" if an MRI fails to reveal a meniscal tear (R. 561). An MRI conducted on October 14, 2008 revealed no evidence of a meniscal tear, although it did indicate mild degenerative changes and a thickening of the patellar tendon (R. 560).

5

On October 16, 2008, Dr. Markarian had a follow-up appointment with Mr. Gehrke to discuss the MRI (R. 557). Dr. Markarian posited that Mr. Gehrke may have Complex Regional Pain Syndrome based on the fact that both of the functional capacity evaluations were invalided due to "disproportionate pain responses" (*Id.*). Dr. Markarian referred Mr. Gehrke to Andrew Hendrix, M.D., who examined him, noted "patchy numb regions" and "mildly cyanotic" (bluish) skin tone, and concluded there was a possibility of CRPS (R. 609-10).

On February 12, 2009, Dr. Kevin Tu, an orthopedic surgeon, provided an independent medical evaluation of Mr. Gehrke and concluded that his "history, examination, and imaging studies are consistent with right knee traumatic patellar instability complicated with arthrofibrosis and patellar tendinosis further complicated by complex regional pain syndrome" (R. 620). The CRPS caused "significant pain that is out of proportion" and that his work injury of March 1, 2007 was a contributing factor to his current diagnosis (R. 621). He did not believe that any further treatment was reasonable, necessary or likely to improve Mr. Gehrke's current condition (R. 622). He opined that Mr. Gehrke had reached maximum medical improvement with regards to his right knee and that the work restrictions set by Dr. Markarian were "reasonable permanent work restrictions" (R. 623).

On March 12, 2010, Dr. Ravikiran Tamragouri, M.D., conducted an examination at the request of Disability Determination Services (R. 632). Dr. Tamragouri spent 30 minutes with Mr. Gehrke and found that Mr. Gehrke was able to walk without assistance and bear some weight on his right leg, although he walked with a limp favoring his right knee (R. 635). The doctor noted that Mr. Gehrke never used an assistive walking device but suffered some "right knee tenderness, redness and possib[ly] some swelling of the joint" (*Id.*).

On March 17, 2010, Mr. Gehrke received a psychological evaluation from Dr. John Peggau (R. 637-40). Mr. Gehrke reported being depressed on account of his knee injury and his inability to engage in activities he used to enjoy (R. 637). He also reported symptoms of irritability and social withdrawal (*Id.*). Dr. Peggau diagnosed Mr. Gehrke with "Adjustment Disorder with Depressed Mood, chronic" (R. 639).

Dr. Joseph Mehr conducted a Psychiatric Review Technique (R. 642-55) and a Mental Residual Functional Capacity Assessment (R. 656-59) on March 26, 2010. He likewise concluded that Mr. Gehrke has an adjustment disorder with a chronic, depressed mood but that he nevertheless has the cognitive capacity, adaptability, endurance and temperament to handle employment in the work force, as well as the capacity to drive or use public transportation to get to work (R. 645, 658). Dr. Mehr noted that Mr. Gehrke appeared credible and that his emotional complaints were commensurate with his physical problems, yet noted as well that Mr. Gehrke is not on any medication for depression, nor has he received any psychiatric treatment (R. 654).

David Mack, M.D., completed a Physical Residual Functional Capacity Assessment on April 4, 2010 (R. 660-67). He noted that Mr. Gehrke walked with a limp but was able to walk unassisted (R. 661). Dr. Mach found Mr. Gehrke capable of lifting 20 pounds occasionally and 10 pounds frequently, able to stand, sit, and/or walk about six hours each in an eight-hour workday, and to push and/or pull an unlimited amount (*Id.*). He concluded that Mr. Gehrke could perform light work with no squatting or kneeling (R. 662).

Finally, Mr. Gehrke received care between August 2008 and June 2010 from his primary care physician, Dr. Nicholas Recchia (R. 626-30, 669). Dr. Recchia diagnosed him with severe osteoarthritis and tendonitis and prescribed various medications, including Norco and Prednisone (R. 626, 628, 669).

## C.

At the hearing before the ALJ on May 31, 2011, Mr. Gehrke and a vocational expert ("VE") both testified, but first Mr. Gehrke's attorney gave an opening statement in which he characterized the case as "a pain case due to right knee problems" in which no listed impairment is met or equaled (R. 32). The attorney referenced the medical file's suggestion of CPRS, and also acknowledged that Mr. Gehrke has never received any psychiatric treatments of any kind (*Id.*).

Mr. Gehrke then testified, stating that he is married with two children and lives in a house (R. 34-35). Following his work as a horse trainer, he worked a variety of jobs including bus driver, truck driver and paper shredder, before beginning his employment with Walker Processing, for whom he did a variety of jobs including sandblasting (R. 51-53). He has never had a desk job and has always been employed in jobs requiring him to be on his feet (R. 60). After his injury in March of 2007, Mr. Gehrke attempted to secure work in a reduced capacity, but his employer refused and he was eventually laid off (R. 53-54). He filed a worker's compensation claim and received a settlement of $132,000 (R. 54).

Mr. Gehrke stated that he drives only a few times a week because of problems with his knee (R. 35-36). He described each of his three surgeries and explained that a total knee replacement is not on the table on account of his young age (R. 38). He stated that he did not feel better after his surgeries and that his knee is essentially as bad as it was when he first injured it (R. 55). Currently, his knee problems include locking up, swelling and pain, requiring him to occasionally use crutches and/or a brace (R. 39-40, 56). He ices his knee on a daily basis, between three and four times a day (R. 40-41).

Mr. Gehrke visits his primary care doctor every two months and takes prescription medication for high blood pressure, migraines and pain (R. 42). His stated that his visit with the pain specialist was unfruitful as the doctor did not think he could be of any help (R. 60). His pain medication, Vicodin, makes him drowsy, and he typically takes at least five doses of 750 milligrams each day (R. 43). He finds standing to be the most painful, so he alternates between standing, lying down, and sitting in a recliner chair with his leg elevated (R. 43, 56). He cannot walk a block, needs to hold onto a railing when climbing stairs, and never goes without pain medication (R. 45-46). On the day of the hearing, he rated his pain as an eight on a pain scale of ten (R. 59). He sleeps poorly on account of his pain and naps during the day for about 45 minutes (R. 47-48). He watches TV but finds it hard to concentrate on account of his pain (R. 57). He did not struggle with depression prior to his knee injury (R. 61).

Regarding activities of daily living, Mr. Gehrke stated that he needs help getting dressed and taking a shower (R. 48). He does not do household chores besides paying bills, and while he goes out with family members to shop for groceries, he needs to hang onto the cart (R. 49). He tried to mow the lawn in the summer of 2010 but was forced to stop after about 15 minutes (R. 57-58). He described his "bad" days as "crippling," and stated that he has a crippling day about once a month (R. 58-59). His pain is a constant presence and damp weather makes his pain even worse (R. 59).

The VE testified next. The ALJ presented a hypothetical to the VE involving a younger individual with a tenth grade education who could perform light work with no stooping, only occasional kneeling, and mild to moderate impairments in the categories of daily living, social functioning, and persistence or pace (R. 66). The VE testified that such an individual would not be able to perform Mr. Gehrke's past work because of the level of exertion required by these

9

jobs, but could perform the jobs of ticket taker, information clerk, and mail clerk (R. 65-67). Moving to a second hypothetical involving the same facts as above but with additional physical restrictions, such as never climbing ropes or scaffolds, the VE testified that such a hypothetical individual could perform only one of the three jobs previously suggested (R. 67). The ALJ presented a third hypothetical, involving an individual capable of lifting up to 20 pounds occasionally and ten pounds frequently, but with standing or walking limited to two hours a day and sitting limited to six hours a day. The VE said this individual would be capable of sedentary jobs such as information clerk, order clerk, and hand packager (R. 68-69).

The ALJ then presented a fourth hypothetical involving an individual with the same exertional limitations as the third hypothetical, but who also had marked difficulties with concentration, persistence, or pace, such that tasks were limited to one or two steps and that allowed the individual to be off-task about 20 percent of the time due to pain (R. 69). In this instance, the VE testified that no jobs would be available to such an individual because the off-task component would exceed employer tolerance (*Id.*). Similarly, in hypothetical number five involving the same individual as number four but also adding in a sit/stand option of 20 minutes at a time (which would be off-task time), such an individual would not be capable of employment due, once again, to a lack of employer tolerance for a sit/stand option such as this (R. 70).

**D.**

On July 18, 2011, the ALJ issued an opinion finding Mr. Gehrke disabled from March 7, 2007 through September 17, 2008 pursuant to sections 216(i) and 223(d) of the Social Security Act (R. 13). However, as of September 17, 2008, the ALJ determined that Mr. Gehrke had medically improved such that he regained the ability to perform substantial gainful activity from

10

that date onward (*Id.*). Accordingly, the ALJ determined that Mr. Gehrke's disability ended on September 17, 2008 (*Id.*).

In evaluating the claim, the ALJ applied the five-step sequential process detailed in 20 C.F.R. § 404.1520(a)(4), which required her to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) can perform her past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If the ALJ finds at Step 3 that the claimant has a severe impairment that does not equal one of the listed impairments, she must assess and make a finding about the claimant's residual functional capacity ("RFC") before moving on to Step 4. *See* 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at Steps 4 and 5 whether the claimant can return to his past work or different available work in the national economy. *See* 20 C.F.R. § 404.1520(e)-(g). The claimant bears the burden of proof at Steps 1 through 4, but the burden shifts to the Commissioner at Step 5. *See Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

If the ALJ finds the claimant to be disabled at any point in the process, she must determine whether the disability continues or ends. To do so, she must follow an eight-step process set forth in 20 C.F.R. § 404.1594(f). Some of these eight steps are redundant of the five-step process discussed above, but a number of the steps involve new inquiries, including whether the claimant has experienced "medical improvement" and whether any such medical improvement is related to the ability to do work. *Id.* at § 404.1594(f)(3)-(4).

At Step 1 of the five-step sequential process, the ALJ found that Mr. Gehrke had not engaged in substantial gainful employment since his alleged onset date of March 7, 2007 (R. 16).

11

At Step 2, she found that Mr. Gehrke's right knee injury, "status post 3 knee procedures," and depression qualified as severe impairments, and then found at Step 3 that Mr. Gehrke's knee impairment qualified as a disability between March 7, 2007 and September 17, 2008 (R. 16-18).

At this point in the analysis, the ALJ turned to the separate, eight-step inquiry to determine whether Mr. Gehrke had then experienced a medical improvement that rendered him capable of working (R. 17-19). Relying greatly on the opinion of treating physician Dr. Markarian, the ALJ concluded that Mr. Gehrke achieved medical improvement related to his ability to do work (albeit with numerous restrictions) as of September 17, 2008 (R. 18). The ALJ then determined that, as of this date, neither Mr. Gehrke's knee injury nor his depression met or medically equaled any of the impairments listed in the Listing of Impairments (*Id.*). The ALJ concluded at Steps 4 and 5 that although Mr. Gehrke could not perform his past relevant work, he did have the RFC to perform the tasks required of an information clerk, order clerk, and hand packager, all of which are sedentary jobs (R. 20-21). Accordingly, the ALJ found Mr. Gehrke not disabled after September 17, 2008.

### III.

We will uphold the ALJ's determination if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision. *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *Pepper*, 712 F.3d at 362. In asking whether the ALJ's decision has adequate support, this Court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

Mr. Gehrke makes one argument on appeal: that the ALJ erred in failing to properly apply the "medical improvement" standard set forth in 20 C.F.R. § 404.1594(f)(3) (Pl.'s Mem. at 11). Although Mr. Gehrke provides only the most minimalistic of arguments, the crux of his position is that the ALJ failed to consider evidence showing that his knee condition, and his pain, have not improved so as to permit him to perform work. The Commissioner maintains that the ALJ properly followed the eight-step sequential process and, further, that the ALJ is not required to address every piece of evidence in her opinion (Def.'s Mem. at 3-5). We agree with Mr. Gehrke that a remand is in order, although not entirely for the reasons he argues.

**A.**

As discussed above, 20 C.F.R. § 404.1594(f) sets forth an eight-step process for an ALJ to use in determining whether a disability continues or ends. The third step of this process required the ALJ in this case to determine whether "medical improvement" had occurred relative to Mr. Gehrke's severe impairment(s). *Id.* at § 404.1594(f)(3). "Medical improvement" is defined as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 404.1528)." *Id.* at § 404.1594(b)(1).

In three sentences, the ALJ found that, as of September 17, 2008, Mr. Gehrke's right knee achieved medical improvement (R. 18).[5] The ALJ noted that Dr. Markarian had released Mr. Gehrke from his care on September 16, 2008, although "with permanent restrictions accounted for in the residual functional capacity assessment" (*Id.*). The ALJ also noted that Dr.

---

[5] Mr. Gehrke does not argue that the ALJ erred in determining medical improvement relative to his depression. Therefore, we focus solely on Mr. Gehrke's right knee.

Markarian "reported that the claimant had met maximum medical improvement," and that a "light-duty desk job would thus be appropriate" (*Id.*).

The first problem with the ALJ's analysis is that she specifically referred to only a single piece of evidence—Page 11 of Exhibit 9F (which is the same as Page 565 of the medical record)—but that document does not directly address the issue of medical improvement. Rather, the document summarizes an office visit in which Dr. Markarian examined Mr. Gehrke, noted complaints of pain "over his iliotibial band," and opined that Mr. Gehrke had "maxed out in terms of his physical therapy" (*Id.*). While the ALJ also referred to the fact that Dr. Markarian had released Mr. Gehrke to go back to work on September 16, 2008 as a further indicator of medical improvement, she did so without acknowledging that the document underlying this finding, the September 16th Notice of Work Release, likewise contains no information bearing directly on the matter of medical improvement (R. 564). This document cleared Mr. Gehrke for a "light duty desk job," but the diagnoses it contains—right knee "medial hamstring tendonitis [and] patella femoral pain"—are the exact same diagnoses provided in the July and August 2008 Notices of Work Status wherein Dr. Markarian found Mr. Gehrke unable to return to work (R. 570, 576). Nothing can be gleaned from the September Notice of Work Release regarding the functionality of Mr. Gehrke's knee on that date, as opposed to an earlier point in time.

We surmise from the ALJ's discussion that she made an inference of medical improvement from the fact that Dr. Markarian cleared Mr. Gehrke for modified work on September 16, 2008. However, Dr. Markarian's note does not indicate the basis for his conclusion that Mr. Gehrke could perform that work. It was incumbent upon the ALJ to make "[a] determination that there has been a decrease in medical severity . . . based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [Mr. Gehrke's]

14

impairment(s)." 20 C.F.R. § 404.1594(b)(1). By relying on documentation that bore no trace of symptomology or laboratory findings, the ALJ has left the Court guessing as to how she determined that Dr. Markarian's note was persuasive on the issue of whether Mr. Gehrke had achieved medical improvement as of September 17, 2008.

A second—and related—problem with the ALJ's determination involves her adoption of the term "maximum medical improvement" as a synonym for "medical improvement" within the context of 20 C.F.R. § 404.1594. Dr. Markarian's notes frequently refer to the question of whether Mr. Gehrke's knee had achieved "maximum medical improvement." For instance, Dr. Markarian anticipated during an August 19, 2008 appointment that Mr. Gehrke would achieve "maximum medical improvement" after four additional weeks of physical therapy (R. 571). Similarly, during an office visit on October 9, 2008, Dr. Markarian stated that he wanted to order an MRI of Mr. Gehrke's knee to rule out a meniscal tear (R. 561). In the event the MRI results were normal (and the results were "unremarkable" except for some tendon thickening (R. 557)), then Dr. Markarian said he would consider Mr. Gehrke to be at "maximum medical improvement" (*Id.*).

The ALJ placed great significance on the doctor's use of this phrase and repeatedly incorporated it into her discussion of Mr. Gehrke's "medical improvement." But, these two terms are not invariably synonymous. "Maximum medical improvement" is not a defined term under the Social Security Act; rather it is a term used frequently within the framework of workers' compensation and refers to the point in time in which an injury or condition has stabilized and further improvement is unlikely.[6] By contrast, "medical improvement" within the context of a Social Security disability case involves an analysis of whether a patient has had a

---

[6]*See* definitions.uslegal.com/m/maximum-medical-improvement-mmi/.

lessening or cessation of symptoms during a fixed period; specifically, within the time period "since the time of the most recent favorable medical decision that you were disabled." 20 C.F.R. § 404.1594(b)(1). A patient at some point will achieve "maximum medical improvement" in the sense that his condition will not get any better, but that does not automatically mean that this patient has achieved "medical improvement" within the meaning of Section 404.1594.

For example, a person who suffers a serious injury that leaves him paralyzed at some point may reach maximum medical improvement, but that does not necessarily mean he is then capable of working. Of course, Mr. Gehrke does not suffer from such a profound impairment. Still, Dr. Markarian's notes do not disclose what improvement Mr. Gehrke experienced that rendered him capable of working as of September 17, 2008, and this is especially important given that the doctor found him incapable of working one month earlier. As the record does not reveal whether Dr. Markarian's use of the term "maximum medical improvement" is synonymous with "medical improvement" within the meaning of the Social Security regulations, the ALJ on remand should consider the terms separately and bear in mind that the medical improvement standard within the Social Security realm looks at improvement within a period of time following a diagnosis of disability.

An additional point concerns whether Mr. Gehrke suffers from Complex Regional Pain Syndrome. The ALJ never mentioned this condition, yet numerous doctors raised it as a real possibility in light of Mr. Gehrke's complaints of chronic pain, his apparent difficulty in complying fully with his physical therapy regime, and his inability to complete several functional capacity evaluations. Drs. Freedberg, Markarian, Tu and Hendrix all expressed the plausibility of this diagnosis. In fact, Dr. Tu stated that "Mr. Gehrke has physical findings that are consistent with complex regional pain syndrome. Specifically, Mr. Gehrke has significant pain with just

16

light touch of the skin" (R. 621). We find the ALJ's failure to address this evidence significant. The ALJ stated that Mr. Gehrke's testimony about the intensity, persistence and limiting effects of his impairments were not credible to the extent it was inconsistent with the RFC after September 16, 2008 (R. 19), and that his complaints "are out of proportion to the objective medical evidence" (R. 20). However, if Mr. Gehrke suffers from CRPS, that could explain the discrepancy noted by the ALJ, as CRPS results in a person experiencing pain that appears out of proportion to the initial injury (*see* note 3, *supra*).

Since multiple doctors indicated that Mr. Gehrke may have that condition, we cannot dismiss the ALJ's silence on that question as harmless. On remand, the ALJ should delve into this condition to the extent that it bears upon the nature and degree of Mr. Gehrke's medical improvement, his functional capacity and his credibility. Social Security Ruling 03-02p provides guidance on evaluating cases involving CRPS. SSR 03-02p, 2003 WL 22399117 (Oct. 20, 2003)). *See also Warner v. Commissioner of Social Sec.*, No. 1:12CV447-PPS, 2014 WL 1047814 (N.D. Ind., Mar. 17, 2014 (discussing SSR 03-02p).

**B.**

In sum, the Court agrees with Mr. Gehrke that the ALJ did not satisfy her obligation under Section 404.1594(b)(1) to analyze whether he had achieved medical improvement relative to his right knee. Reliance on an unexplained reference to "maximum medical improvement" is not an acceptable substitute for the required analysis. We therefore agree that this case must be remanded for further proceedings.

In so concluding, we in no way suggest that on remand Mr. Gehrke must be found disabled after September 17, 2008. We recognize that the medical record contains evidence that might support a finding that he no longer is disabled. It will be for the ALJ to consider all the

evidence that bears on whether Mr. Gehrke continued to be disabled after September 17, 2008, and to build a logical bridge from that evidence to whatever conclusion she reaches.

## CONCLUSION

For the foregoing reasons, we grant Mr. Gehrke's motion for summary judgment seeking a remand of the ALJ's decision (doc. # 25) and deny the Commissioner's motion for summary judgment seeking an affirmance (doc. # 33). On remand, the ALJ will have an opportunity to reevaluate all of the evidence of record.

ENTER:

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

DATE: September 22, 2014